1

2

3

4

5

6                           UNITED STATES DISTRICT COURT
                          WESTERN DISTRICT OF WASHINGTON
7                                    AT SEATTLE

8   SMARTWINGS, A.S., a Czech Republic          CASE NO. C21-918 RSM
    Company,
9                                               ORDER GRANTING IN PART
                      Plaintiff,                DEFENDANT'S MOTION TO DISMISS
10
           v.
11
    THE BOEING COMPANY, a Delaware
12  Corporation,

13                    Defendant.

14

15                          **I.      INTRODUCTION**

16          This matter is before the Court on Defendant The Boeing Company's Motion to Dismiss,

17  Dkt. #15, and its subsequently filed Motion for Protective Order, Dkt. #18.  Plaintiff Smartwings,

18  a.s. ("Smartwings"), has sued Defendant The Boeing Company ("Boeing") for damages related

19  to its purchase of Boeing's 737-8 aircraft (the "737MAX").  Smartwings purchased or leased 45

20  737MAXs.   In October 2018, and while the parties continued performance under their

21  agreements, Lion Air Flight 610, a 737MAX, crashed from the sky.  Boeing assured the public

22  that the 737MAX was "as safe as any aircraft in the sky."  But in March 2019, a second 737MAX,

23  Ethiopian Airlines Flight 302, crashed from the sky.  After the second crash, the 737MAX was

24

    ORDER – 1

1    grounded by the FAA and Boeing acknowledged defects in the 737MAX.  Smartwings, which

2    had structured its business to rely on the 737MAX, experienced extensive losses as a result.

3            Seeking to hold Boeing responsible, Smartwings has sued Boeing for its losses.

4    Smartwings alleges theories of breach of contract (first and second claims), breach of the duty of

5    good faith and fair dealing (third claim), fraud (fourth claim), material misrepresentation (fifth

6    claim), violation of the Washington Consumer Protection Act (sixth claim), and violation of the

7    Washington Products Liability Act (seventh claim).  *See generally* Dkt. #1-2.  In its motion to

8    dismiss, Boeing only seeks dismissal of Smartwings' non-contract claims.    Dkt. #15.

9    Accordingly, Smartwings' first and second claims are not addressed.  Additionally, Boeing's

10   motion for a protective order seeks to limit discovery on Smartwings' non-contract claims until

11   after the Court has ruled on its motion to dismiss those claims.  Having considered the issues, the

12   Court grants the motion to dismiss in part and denies Boeing's motion for a protective order as

13   moot.

14                           II.      BACKGROUND

15           The  Court  adopts  and  sets  forth  Smartwings'  statement  of  the  relevant  factual

16   allegations:[1]

17   **A.      Commercial Pressures Push Boeing to Implement Flawed Flight
             Software on the MAX to Mimic the Handling of the Materially
18           Different 737NG.**

19           In July 2011, Boeing found itself outpaced by the product development and
     commercial success of its archrival aerospace manufacturer, Airbus.  (Compl.
20   ¶¶ 36–39.).  To catch up, Boeing scrapped its only-recently-trumpeted plans to
     design a new narrow-body passenger aircraft and announced it would once again
21   update the almost 50-year-old 737 design with new fuel-efficient engines.  Boeing

22   _____

     [1] In considering a motion pursuant to Rule 12(b)(6), "[a]ll allegations of material fact are taken
23   as true and construed in the light most favorable to the nonmoving party." *Sprewell v. Golden
     State Warriors*, 266 F.3d 979, 988 (9th Cir. 2001) (citations omitted).  Smartwings has provided
24   clear citations to the allegations of its complaint and Boeing has not objected to Smartwings'
     characterization of the complaint's allegations.

     ORDER – 2

branded it the 737 MAX. (*Id.* ¶ 40.).  To save time and money and to reduce FAA scrutiny, Boeing decided to certify the MAX under the 1967 737 Type Certificate. (*Id.* ¶¶ 41–42.)  Boeing was also determined to avoid any regulatory requirement for significant pilot "differences" training for existing 737 pilots.  This required Boeing to convince the FAA that the MAX handled like a 737NG. (*Id.* ¶¶ 43–47).

But MAX's new engines were too large to fit the airframe unless they were moved forward and up. Boeing's engineers anticipated that this change would create a new and unacceptable handling issue that could cause the MAX to pitch up, losing airspeed and risking a stall, in some unusual flight regimes. (*Id.* ¶¶ 48–54.) Boeing could have applied well-understood (but more expensive and time-consuming) aerodynamic engineering principles to fix the problem.  Instead, it chose a software fix called MCAS.

As originally conceived, MCAS would activate under high-G, near-stall conditions and automatically apply downward stabilizer trim.  From the pilot's perspective, the MAX would handle like the 737NG, with MCAS smoothing out the differences.  (*Id.* ¶¶ 55–57.)  But in flight testing the MAX exhibited an unanticipated problem—the aircraft also pitched up during low-speed maneuvers. (*Id.* ¶ 58.)  Again opting for the quicker, cheaper fix, Boeing made critical and dangerous changes to MCAS to patch over the problem.

Boeing made MCAS four times more powerful than before so that it pushed the aircraft's nose down much more aggressively.  Boeing also eliminated one of the two inputs required to trigger the system, leaving MCAS's activation entirely reliant on the output of a single Angle of Attack ("AOA") sensor.  If the AOA sensor showed the nose pitched up and nearing a stall, MCAS would aggressively push the nose down.  (*Id.* ¶ 59.)  But AOA sensors are prone to malfunction, and despite the MAX having two sensors, Boeing chose to have MCAS rely on the readings of only one while including no self-diagnostic software to test that the AOA was functioning properly.  (*Id.* ¶ 60–61.)  Further, Boeing programmed MCAS to reset itself for five seconds after applying downward trim for ten seconds, never stopping so long as the sensor continued to show the aircraft close to stalling. (*Id.* ¶ 62.)

B.    **Boeing Misrepresents and Conceals MCAS's Catastrophic Potential to the FAA.**

Boeing knew MCAS could make the MAX dangerously difficult for pilots to control.  In November 2016—seven months before the first MAX delivery—a Boeing test pilot reported MCAS was "running rampant" with the aircraft "trimming itself like cra[z]y" in simulations. (*Id.* ¶ 67.) In 2015, a Boeing engineer raised concerns about MCAS's reliance on a single sensor but was ignored.  (*Id.* ¶ 68.)  And Boeing's formal Safety System Analysis of MCAS was deeply flawed. Portions of the analysis evaluated the early MCAS design before Boeing increased its power by a factor of four.  It also failed to account for the effect of the cascade of alarms that would follow a false AOA reading.  It did not disclose that an MCAS

ORDER – 3

malfunction at normal climb or cruise speeds would be substantially more dangerous than at low speeds or that the aircraft's 15-second nose down cycle could put the aircraft into an unrecoverable dive. (*Id.* ¶¶ 69–77.) Relying on this deeply flawed analysis, Boeing falsely told the FAA that an MCAS malfunction would be a "major" failure (defined by regulation as a failure that could cause "physical distress to occupants of aircraft" but not a "catastrophic" failure that could result in multiple fatalities or loss of the aircraft. (*Id.* ¶¶ 79–80.) Boeing ultimately obtained certification of the MAX by misrepresenting, omitting, and concealing the nature of MCAS from the FAA. At the same time Boeing successfully lobbied the FAA to waive requirements for other cockpit alert and indicator updates because they were too "costly" and "impractical" to implement on the aged 737. (*Id.* ¶ 81.)

Boeing also needed to convince the FAA that existing 737NG pilots should be allowed to fly the MAX with minimal, computer-based training that Boeing knew would not be allowed if pilots were to be properly trained on MCAS. (*Id.* ¶¶ 81–84.) Boeing's solution was simply to pretend that MCAS did not exist. Thus, Boeing falsely told the FAA that MCAS failures would be rare and would mimic a condition called "runaway trim" that pilots were already trained to diagnose and address. (*Id.* ¶¶ 85–87.) That was false—MCAS failures act very differently than runaway trim. (*Id.* ¶¶ 88–89.) By withholding critical information, Boeing convinced the FAA to approve its scheme to conceal MCAS from purchasers and pilots entirely. (*Id.* ¶¶ 90–91.)

In 2017, Boeing's MAX Chief Pilot told the public the MAX would be configured such that 737NG pilots could fly the aircraft with two-and-a-half hours of computer training, without disclosing the plane's altered flight dynamics or MCAS. (*Id.* ¶ 93.) Meanwhile, Boeing was carefully scrubbing any mention of MCAS from materials provided to purchasers. ((*Id.* ¶¶ 95–98.) The operators and pilots responsible for the lives of MAX passengers would have no idea MCAS existed.

**C.**      **Boeing Conceals the MAX's Flaws From Smartwings While Pushing Smartwings to Take Delivery of Fatally Defective Aircraft.**

When Boeing began marketing the MAX, it repeatedly assured Smartwings that the updated aircraft would retain the design and "unparalleled" safety record of the 737NG and told Smartwings that "Cockpit commonality [from NG to MAX] results in no requirement for a new MAX simulator." (*Id.* ¶¶ 110–112.) Convinced by Boeing's repeated representations of the MAX's superior quality, product support, safety, reliability, and the ease of certification for pilots, Smartwings decided to buy or lease 45 MAX's and transition to an all-MAX fleet. (*Id.* ¶¶ 113–119, 123.) On June 13, 2016, Boeing told Smartwings that transition training from the 737NG to MAX would take one day and require no simulator time, providing the "most cost effective transition solution with minimal training investment." (*Id.* ¶¶ 120–121.) In December 2017, it continued its marketing to Smartwings, touting the MAX's advantages and asserting that "737 flight crews will feel at home in the MAX." (*Id.* ¶ 122.)

ORDER – 4

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Each aircraft Smartwings received from Boeing before the grounding was accompanied by a Detail Specification, which was supposed to be a thorough and accurate description of the aircraft and its systems.  MCAS was not mentioned in the Detail Specifications even though other similar systems were.  (*Id.* ¶¶ 99–102.) Any mention of MCAS was also carefully scrubbed from the purchase documents, operations documents, and normal or emergency procedures manuals for the MAX. Moreover, the aircraft was represented to be equipped with an "AOA disagree" warning light that would alert pilots to AOA sensor malfunctions.  Boeing knew the AOA disagree warning did not work on new MAX's, but opted not to fix the problem until a future software update.  Thus, Boeing delivered MAX aircraft to Smartwings knowing the Detail Specification was incomplete and that the planes did not even conform to the Detail Specification that was provided.  (*Id.* ¶¶ 103– 105.)

On October 28, 2018, Lion Air Flight 610 crashed outside Jakarta, killing all 189 souls on board.  (*Id.* ¶ 134.)  Unbeknownst to the crew, the aircraft's pilot-side AOA sensor (which controlled MCAS) erroneously reported the aircraft in a stall even though the copilot-side sensor unused by MCAS worked properly.  As a result, MCAS pushed the aircraft's nose sharply down 26 times.  The crew successfully counteracted MCAS through electrical and manual application of nose-up trim 22 times before the system overpowered the pilots and pushed the aircraft into a fatal dive into the sea.  (*Id.* ¶¶ 134–138.)

In response to the crash, on November 6, 2018, Boeing issued a bulletin to MAX pilots and operators that maintained the fiction that MCAS did not exist but provided guidance on how to address an "uncommanded nose down stabilizer trim."  It also issued statements blaming Lion Air's pilots for not mis-diagnosing the MCAS failure as a trim runaway.  (*Id.* ¶¶ 139–141.)  On November 8, 2018, the FAA issued an Emergency Airworthiness Directive ordering Boeing to modify MAX manuals to include specific warnings and procedures to respond to an erroneous MCAS activation.  Boeing never did so.  Instead, two days later, Boeing emailed its customers and for the first time provided minimal information about MCAS's existence together with imprecise instructions on how pilots could disable it.  (*Id.* ¶¶ 145–147.)

Smartwings raised concerns about the safety of the MAX directly with Boeing after the Lion Air crash.  On November 27, 2018, its CFO wrote Boeing expressing doubt that the Lion Air crash was purely due to pilot error, and emphasized that Smartwings' passengers and pilots were concerned about the aircraft's safety.  (*Id.* ¶¶ 148–149.)  Boeing brushed off Smartwings' inquiry, but in January 2019 it issued a press release with no mention of MCAS and implying Lion Air's pilots and maintenance personnel were responsible.  It asserted that "our customers and their passengers . . . have our assurance that the 737 MAX is as safe as any airplane that has ever flown the skies."  (*Id.* ¶¶ 150–151.)  In February 2019, Smartwings CFO again contacted Boeing reiterating its safety concerns and asserting it would not accept delivery of the aircraft scheduled for March 2019

ORDER – 5

1   without a substantive response.  Boeing never addressed Smartwings' concerns but
2   instead asserted it "expected" Smartwings to take delivery because it was required
    to do so by contract.  (*Id.* ¶¶ 152–153.)

3   Ethiopian Air Flight 302 crashed on March 10, 2019, killing all 159 on
4   board.  Its AOA sensor was reporting a physically-impossible 75-degree angle of
    attack, which activated MCAS and drove the plane into an unrecoverable dive.  (*Id.*
5   ¶¶ 154–159.)  A few hours after the crash Smartwings notified Boeing it would not
    accept delivery of further MAX aircraft without certification of their safety.  After
6   regulators around the world grounded MAX, Boeing agreed that it was not safe to
    fly.  (*Id.* ¶¶ 160–163.)

7   Smartwings planned to operate 16 MAX aircraft during its 2019 peak
8   season and had sold almost all of that capacity by March 2019.  Smartwings
    accepted delivery of seven aircraft before the Ethiopian crash.  (*Id.* ¶¶ 130–132,
9   203.)  Smartwings was left with seven aircraft it was obligated to continue paying
    for but could not fly, and scrambling to replace MAX capacity with alternative,
10  more expensive aircraft and to compensate passengers for flight disruptions.
    Boeing refused to take any MAXs back, so today Smartwings possesses MAX
11  aircraft with severely diminished value (*Id.* ¶¶ 207–09).  Smartwings has suffered
    hundreds of millions of dollars in damages as a result of Boeing's malfeasance.

12  **D.      Investigations and Litigation Reveal Some of Boeing's Deceptions.**

13  On April 4, 2019, Boeing's CEO admitted MCAS was the likely cause of
    the Lion Air and Ethiopian crashes due to erroneous AOA readings, and that it was
14  Boeing's responsibility to "eliminate the risk" of erroneous MCAS activation.  To
    recertify the MAX for the FAA and European Union, Boeing has to make numerous
15  significant changes, including:

16  •   New flight control software to prevent erroneous MCAS activations;

17  •   Updated cockpit display software to generate an AOA disagree alert to
        notify pilots of potential sensor failures;
18
    •   Adding and revising operating procedures and flight manuals that
19      actually mention MCAS, and requiring proper pilot training on MCAS
        and MCAS failures; and
20
    •   Changing how MAX's horizontal stabilizer trim wires route in the
21      aircraft to comply with the FAA's wire-separation standards.

22  (*Id.* ¶¶ 165–174.)

23  Meanwhile, Boeing's conduct has or is being investigated by Congress and
    the Department of Justice and other executive agencies and Boeing is subject to
24  private litigation by crash victims, its shareholders, its customers, and pilots.

ORDER – 6

1

2

3

4

5

6

7

8

9

10

11

12

Although many relevant documents have remained sequestered from the public, the documents that are public confirm Boeing's misconduct and are likely only the tip of the iceberg. (*Id.* ¶¶ 175–177.) They show Boeing pushing Lion Air not to require simulator training for transitioning pilots, asserting that "[o]nce the engines are started, there is only one difference between NG and MAX procedurally, and that is that there is no OFF position to the gear handle." (*Id.* ¶¶ 178–181.) Partially redacted documents show Boeing employees mocked federal rules and talked about deceiving the FAA, with one employee stating "still haven't been forgiven by God for the covering up I did last year" in reference to MCAS. (*Id.* ¶¶ 182–185.) Documents also show Boeing placed intense pressure on its teams to avoid any simulator training for pilots, that by 2013 it was executing a strategy to deceive its customers about MCAS, and that Boeing concealed internal analyses and data showing the potential for "catastrophic" MCAS failures. (*Id.* ¶¶ 186–192.) The House Committee on Transportation and Infrastructure issued a report on the MAX in September 2020, finding a "disturbing pattern of technical miscalculations and troubling management misjudgments" that "gambled with the public's safety." (*Id.* ¶ 193.) In January 2021, Boeing entered into a deferred prosecution agreement with the United States, admitting that it had identified faults in MCAS but illegally concealed that information from the FAA. (*Id.* ¶ 194.) And, in February 2021, the FAA's Inspector General found that Boeing had repeatedly failed to fully inform the FAA about "significant changes to MCAS" including "assumptions relating to how pilots would react to erroneous MCAS activation and the impact of not reacting in a timely manner." (*Id.* ¶ 195.)

13

Dkt. #21 at 8–14.[2]

14

### III.     DISCUSSION

15

### A. Legal Standard

16

Dismissal under Federal Rule of Civil Procedure 12(b)(6) "can be based on the lack of a

17

cognizable legal theory or the absence of sufficient facts alleged under a cognizable legal theory."

18

*Balistreri v. Pacifica Police Dep't*, 901 F.2d 696, 699 (9th Cir. 1990); *see also* FED. R. CIV. P.

19

8(a)(2). While considering a Rule 12(b)(6) motion, the court accepts all facts alleged in the

20

complaint as true and makes all inferences in the light most favorable to the non-moving party.

21

*Baker v. Riverside Cnty. Office of Educ.*, 584 F.3d 821, 824 (9th Cir. 2009) (citations omitted).

22

The court is not required, however, to accept as true a "legal conclusion couched as a factual

23

24

---

[2] Throughout, the Court cites to the document and page numbers assigned by the Court's CM/ECF system, unless otherwise indicated by paragraph number or page and line numbers.

ORDER – 7

1    allegation." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*,

2    550 U.S. 544, 555 (2007)). "Determining whether a complaint states a plausible claim for relief

3    will . . . be a context-specific task that requires the reviewing court to draw on its judicial

4    experience and common sense." *Id.* at 679 (citations omitted).

5          "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

6    accepted as true, to 'state a claim to relief that is plausible on its face.'" *Id.* at 678 (quoting

7    *Twombly*, 550 U.S. at 570). This requirement is met when the plaintiff "pleads factual content

8    that allows the court to draw the reasonable inference that the defendant is liable for the

9    misconduct alleged." *Id*. (quoting *Twombly*, 550 U.S. at 556). The complaint need not include

10   detailed allegations, but it must have "more than labels and conclusions, and a formulaic

11   recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. "The

12   plausibility standard is not akin to a probability requirement, but it asks for more than a sheer

13   possibility that a defendant has acted unlawfully. . . . Where a complaint pleads facts that are

14   merely consistent with a defendant's liability, it stops short of the line between possibility and

15   plausibility of entitlement to relief." *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 556,

16   557). Absent facial plausibility, a plaintiff's claims must be dismissed.

17       **B. Breach of the Duty of Good Faith and Fair Dealing Claim**

18          Under Washington law, a "duty of good faith and fair dealing" is implied in every

19   contract. *Badgett v. Security State Bank*, 116 Wash. 2d 563, 569, 807 P.2d 356, 360 (1991).

20   Here, Smartwings asserts, as its third claim for relief, that Boeing's conduct has violated its duty

21   of good faith and fair dealing under the parties' contracts. Dkt. #1-2 at ¶¶ 265–270. Boeing

22   counters that Smartwings has failed to adequately invoke such a claim because it has "not

23   identif[ed] any contract term over which Boeing [had] discretionary authority, as required under

24

ORDER – 8

1   settled Washington law." Dkt. #15 at 10. At this stage, the Court does not find Boeing's

2   argument persuasive or dismissal appropriate.

3        Boeing, as the defendant, has the burden of "showing that no claim has been presented."

4   *Hedges v. United States*, 404 F.3d 744, 750 (3d Cir. 2005) (citing *Kehr Packages, Inc. v.*

5   *Fidelcor, Inc.*, 926 F.2d 1406, 1409 (3d Cir. 1991)). Here, Boeing devotes two paragraphs

6   totaling less than a page to its argument that the Court should dismiss Smartwings' duty of good

7   faith and fair dealing claim. Dkt. #15 at 31; Dkt. #23 at 17. Smartwings likewise devotes only

8   a single paragraph to supporting its good faith and fair dealing claim. Dkt. #21 at 29–30. While

9   some issues are adequately addressed in such limited briefing, the Court does not find resolution

10  of the issue appropriate on this scant record.

11       "The implied duty of good faith and fair dealing arises out of the obligations created by

12  a contract and only exists in relation to the performance of specific contract terms." *Microsoft*

13  *Corp. v. Motorola, Inc.*, 963 F. Supp. 2d 1176, 1184 (W.D. Wash. 2013) (citing *Keystone Land*

14  *& Dev. Co. v. Xerox Corp.*, 152 Wash. 2d 171, 94 P.3d 945, 949 (2004)). "Thus, a party's

15  obligation is only to perform the obligations imposed by the contract in good faith." *Id.* (citing

16  *Barrett v. Weyerhaeuser Co. Severance Pay Plan*, 40 Wash. App. 630, 700 P.2d 338, 342 n. 6

17  (1985)). But "there is no one-size-fits-all definition of good faith and fair dealing." *Id.* While

18  not an exhaustive list, "[i]t may violate the duty of good faith and fair dealing to, for example,

19  (1) evade the spirit of a bargain; (2) willfully render imperfect performance; (3) interfere with or

20  fail to cooperate in the other party's performance; (4) abuse discretion granted under the contract;

21  or (5) perform the contract without diligence." *Id.* (citing RESTATEMENT (SECOND) OF CONTACTS

22  § 205 cmt. d). Importantly, a violation of the duty of good faith and fair dealing does not require

23  a breach of the underlying contract. *Rekhter* v. *State, Dep't of Soc. & Health Servs.*, 180 Wash.

24  2d 102, 111–12, 323 P.3d 1036, 1041 (2014).

ORDER – 9

1      Ignoring all nuance, Boeing represents that "'the duty of good faith and fair dealing'

2   applies *only* 'when one party has discretionary authority to determine a future contract term.'"

3   Dkt. #15 at 31 (quoting *Rekhter*, 180 Wash.2d at 112, 323 P.3d at 1041) (emphasis added).  But

4   *Rekhter* does not support the clearly erroneous contention that the duty of good faith and fair

5   dealing requires identification of a contract term granting a party "discretionary authority."  As

6   *Microsoft Corp.*[3] makes clear, abuse of discretion granted under the contract is only one way in

7   which the duty of good faith and fair dealing may be implicated.  And *Rekhter* does not imply

8   otherwise.  Similarly, Boeing's reply indicates that "the duty of good faith and fair dealing 'exists

9   only in relation to performance of a specific contract term.'"  Dkt. #23 at 17 (quoting *Keystone*,

10  152 Wash. 2d at 177, 94 P.3d at 949).  But this quotation, read in context, indicates only that

11  there is not a duty of good faith and fair dealing in the absence of a "substantive contract."

12  *Keystone*, 152 Wash. 2d at 177, 94 P.3d at 949.

13      Notably, Boeing has not sought dismissal of Smartwings' contractual claims.  Yet

14  Smartwings has not pled the specific contractual terms it alleges that Boeing has breached.  *See*

15  Dkt. #1-2 ¶¶ 244–264.  Boeing accepts that those allegations adequately set forth the conduct

16  that allegedly constituted a breach and no clear distinction exists between the conduct

17  constituting breach of the contracts and the conduct constituting a breach of the duty of good

18  faith and fair dealing.[4]  *See Rekhter*, 180 Wash. 2d at 111–12, 323 P.3d at 1041 (a party may

19

20  _____

[3] Boeing itself cited to *Microsoft Corp.*  Dkt. #15 at 31.

21

22  [4] For instance, Smartwings alleges that the parties' contracts obligated Boeing "to provide an aircraft that conformed to the Detail Specification" and that "Smartwings believed that Boeing accurately represented the build of the aircraft in the Detail Specification" but that "Boeing did not include any mention of MCAS in the Detail Specification."  Dkt. #1-2 at ¶¶ 248, 251–52.

23  The sources provided by Boeing do not establish, at this stage of the proceedings, that the omission of MCAS from the Detail Specification and Boeing's active concealment of MCAS's

24  presence and function did not breach its duty of good faith and fair dealing.

ORDER – 10

1   breach the duty of good faith and fair dealing without going so far as to breach the contract).

2   Smartwings has plausibly alleged a claim for breach of the duty of good faith and fair dealing,

3   which is clearly a cognizable claim under Washington law, and Boeing's legal arguments, to the

4   extent they have merit, are better left for another day.

5       **C. Fraud and Misrepresentation Claims**

6       Smartwings' fourth and fifth claims assert that Boeing acted fraudulently or negligently

7   in omitting and/or misrepresenting material facts related to the 737MAX's similarity to recent

8   iterations of Boeing's 737 aircraft, the need for substantial pilot training on the 737MAX, and

9   the existence and operation of the MCAS system and the dangers posed by the system.  Dkt. #1-

10  2 at ¶¶ 271–309.  This Court has previously considered the propriety of such claims in the context

11  of Boeing's actions as they relate to the 737MAX and MCAS.  *See Wilmington Tr. Co. v. The*

12  *Boeing Co.*, Case No. 20-cv-402-RSM, 2021 WL 754030 (W.D. Wash. Feb. 26, 2021).  In

13  *Wilmington*, this Court determined that the similarities between the claims[5] meant that they could

14  be considered together, that both claims should be subjected to Rule 9(b)'s heightened pleading

15  standard, and that both claims could proceed on the basis that Boeing had omitted, either

16

17  [5] As summarized by Boeing:

18      Stating a claim for fraud under Washington law involves nine essential elements:
        "(1) a representation of existing fact, (2) its materiality, (3) its falsity, (4) the
19      speaker's knowledge of its falsity, (5) the speaker's intent that it be acted upon by
        the person to whom it is made, (6) ignorance of its falsity on the part of the person
20      to whom the representation is addressed, (7) the latter's reliance on the truth of
        the representation, (8) the right to rely upon it, and (9) consequent damage."
21      *Elcon Constr., Inc. v. E. Wash. Univ.*, 273 P.3d 965, 970 (Wash. 2012).  Stating a
        claim for negligent misrepresentation involves establishing six similar elements,
22      the major difference being that negligence regarding the false statement—as
        opposed to knowledge of its falsity and intent to induce reliance—is sufficient to
23      establish a claim.  *Ross v. Kirner*, 172 P.3d 701, 704 (Wash. 2007) (outlining six
        elements).

24  Dkt. #15 at 21 n.9.

ORDER – 11

1    fraudulently or negligently, material facts. *Id.* at *4–6. Boeing maintains that the same result is

2    not appropriate here because (1) Smartwings cannot point to any misrepresentations or omissions

3    prior to the date it entered its contracts with Boeing, (2) that the Washington Products Liability

4    Act precludes such claims, and (3) that, even if the claims are not precluded, Smartwings cannot

5    pursue them here. Dkt. #15 at 14–23. The Court addresses the arguments accordingly.

6

   **1. Smartwings' Does Not Adequately Allege Pre-contract Misrepresentations or**
7    **Omissions Fraudulently Inducing It to Enter the Purchase Agreements**

8        Boeing and Smartwings entered into their relevant agreements in 2013, early in the

9    737MAX's development and, as Boeing represents, well before significant issues with MCAS

10   arose. *Id.* at 15–16. In response, Smartwings argues that it entered the agreements in reliance

11   on Boeing's early representations that the 737MAX would "maintain 'the basic design and

12   "unparalleled" safety record of the 737 NG'" and that minimal pilot training would be required.

13   Dkt. #17 at 21 (citing Dkt. #1-2 at ¶¶ 110–15). But the Court agrees with Boeing that these

14   statements are too general to support Smartwings' fraudulent inducement or omission claims.

15   Rather, the statements are akin to "general praise of goods sold known as sales talk or puffing."

16   Dkt. #15 at 16 n.7 (citing *Baughn v. Honda Motor Co.*, 107 Wash. 2d 127, 150, 727 P.2d 655,

17   668 (1986)) (quotation marks omitted).

18        Further, and as Boeing also argues, these generalized statements came too early in the

19   737MAX's development to reasonably support an argument that Boeing knew, or should have

20   known, them to be false. *See* Dkt. #15 at 16–17. Smartwings argues that "Boeing already knew

21   in 2012 that the [737]MAX had material aerodynamic differences from the 737NG and by June

22   2013 was executing a strategy to downplay MCAS to regulators." Dkt. #21 at 15. But

23   Smartwings' only support is a 2020 news article detailing an internal email between unidentified

24   Boeing employees from "June 2013" which indicates that MCAS should be characterized as an

ORDER – 12

"addition to Speed Trim" to lessen the potential that MCAS could impact the FAA's certification

process or result in a requirement for pilot simulator training.  See Dkt. #1-2 at ¶¶ 189 (quoting

Jamie Freed and Tracy Rucinski, *Factbox: In Boeing internal messages, employees distrust the*

*737 MAX and mock regulators*, REUTERS, Jan. 9, 2020 (available at

https://www.reuters.com/article/us-boeing-737max-factbox/factbox-in-boeing-internal-

messages-employees-distrust-the-737-max-and-mock-regulators-idUSKBN1Z90NP)        (last

accessed Feb. 10, 2022)).  But the email demonstrates only that Boeing was having internal

discussions on how best to address MCAS through the FAA certification process.  The email

cannot, on its own, move Smartwings' allegations for fraudulent inducement—that Boeing was

"executing a strategy to downplay MCAS to regulators" and the public while knowing that the

yet to be implemented MCAS system was faulty and dangerous—from possible to plausible.

### 2. Smartwings' Adequately Alleges Fraudulent Inducement Based on Post-Contract Misrepresentations and Omissions

Boeing next argues that Smartwings' misrepresentation and omission claims, to the extent

they are premised on representations or omissions occurring after the parties entered into their

agreements cannot form the basis for a fraudulent inducement claim.  Dkt. #23 at 9–11.  Boeing

argues that after the contract was formed, all that remained was performance and that Smartwings

cannot be improperly induced to perform its own contractual obligations.  Dkt. #23 at 9.  But

Boeing does not adequately establish that fraudulent inducement must occur at contract

formation.  Boeing relies largely on *Short v. Hyundai Motor Co.*, 444 F. Supp. 3d 1267, 1280

(W.D. Wash. 2020), and its statement that "[t]he duty to disclose, however, depends on

Defendants' knowledge of the alleged defects *at the time Plaintiffs purchased their Class*

*Vehicles*."  Dkt. #15 at 16.  The common purchase of a production vehicle, however, is quite

ORDER – 13

1   different from Smartwings' purchase of yet to be manufactured aircraft that would satisfy

2   contractual specifications and obtain FAA certification.

3          The Court similarly finds its prior *Wilmington* order to be instructive in this regard.

4   Central to that decision was the fact that the *Wilmington* plaintiffs did "not limit their deficiency

5   allegations to the aerodynamic deficiencies created by the addition and placement of larger

6   engines" but also "pointed to 'the use of MCAS in lieu of making aerodynamic changes; the

7   impact of MCAS, such as how it could cause the [737]MAX to enter into a dive with a fault or

8   malfunction in one of the aircrafts two AOA sensors; and the absence of any education or training

9   on MCAS or emergency procedures for its malfunction."[6] *See Wilmington*, 2021 WL 754030 at

10  \*5.  That is, even after Boeing and Smartwings executed their agreements, events relevant to

11  Boeing's performance and Smartwings' ultimate acceptance continued to occur.  Admittedly,

12  such a claim strays precariously close to Smartwings' duty of good faith and fair dealing claims.

13  But the Court leaves those questions for a later date and a fuller record.

14          **3.   WPLA Does Not Preempt Smartwings' Fraud and Misrepresentation Claims**

15          Next, Boeing argues that Smartwings' fraud and misrepresentation claims are precluded

16  by Washington's Product Liability Act.  Dkt. #15 at 18–21.  Boeing characterizes these claims

17  as mere complaints that Boeing did not disclose "alleged '[product] defects'" and argues that the

18

19  ───────────────
[6] The Court notes, of course, that Smartwings did not make the exact same allegations here.  The

20  Court includes the allegations only to illustrate that the events giving rise to Smartwings' fraud claims occurred during Boeing's lengthy development, manufacturing, and certification process.

21  While events occurring after contract execution could not have induced Smartwings to enter into the agreements themselves, the events appear to have impacted performance of the parties'

22  contractual obligations.  *See* Dkt. #21 at 16 (Smartwings noting Boeing's allegedly fraudulent actions to obtain FAA certification, Smartwings' acceptance of the aircraft, and payment under

23  the agreements).  While the relevant contracts are not before the Court, the Court presumes that they are sophisticated agreements with numerous contingencies that could alter that parties'

24  obligations under the agreements.  The Court finds it sufficient to note the plausibility of the claims.

ORDER – 14

WPLA "establishes 'a single cause of action for product-related harms' that 'supplants previously existing common law remedies.'" *Id.* at 18 (citing *Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp.*, 122 Wash. 2d 299, 322–23, 858 P.2d 1054, 1066 (1993)).

The Court finds Boeing's preemption argument incongruent with its other arguments. Boeing argues that Smartwings' common-law misrepresentation and fraud claims are barred by the WPLA's statutory cause of action while at the same time arguing that Smartwings cannot state a claim under the WPLA. Smartwings, as well, notes the incongruence of the positions. Dkt. #21 at 7 (noting that Boeing asserts that Smartwings' fraud claims are preempted by Washington's Product Liability Act ("WPLA")" while also "paradoxically argu[ing] Smartwings has no remedy under the WPLA either because Smartwings' catastrophic losses do not constitute 'harm' under the statute"). The positions cannot be rectified, and the Court finds that the WPLA does not preempt Boeing's common-law fraud claims.

The WPLA "created a single cause of action for product-related harms." *Washington State Physicians*, 122 Wash. 2d at 322, 858 P.2d at 1066. The cause of action—"a product liability claim"—is broad and

> includes, but is not limited to, any claim or action previously based on: Strict liability in tort; negligence; breach of express or implied warranty; breach of, or failure to, discharge a duty to warn or instruct, whether negligent or innocent; misrepresentation, concealment, or nondisclosure, whether negligent or innocent; or other claim or action previously based on any other substantive legal theory *except fraud*, *intentionally caused harm* or a claim or action under [the Washington Consumer Protection Act].

WASH. REV. CODE § 7.72.010(4) (emphasis added). At the same time, the WPLA's comprehensive definition of harm extends to "any damages recognized by the courts of this state" except for "direct or consequential economic loss under" the Uniform Commercial Code. WASH. REV. CODE § 7.72.010(6). Accordingly, the Court finds Boeing's preemption argument better

ORDER – 15

1    considered with its arguments that Smartwings cannot state a cause of action under the WPLA,

2    addressed below.

3          **D.  Washington Consumer Protection Act Claim**

4          Washington's Consumer Protection Act ("WCPA") prohibits "unfair or deceptive acts or

5    practices in the conduct of any trade or commerce." WASH. REV. CODE § 19.86.020.  To establish

6    a WCPA claim, a plaintiff must establish that (1) defendant engaged in an unfair or deceptive act

7    or practice, (2) the act occurred in trade or commerce, (3) the act affects the public interest, (4)

8    plaintiff suffered injury to its business or property, and (5) the injury was causally related to the

9    act. *Trujillo v. Nw. Tr. Servs., Inc.*, 183 Wash. 2d 820, 834–35, 355 P.3d 1100 (2015); *Hangman*

10   *Ridge Training Stables, Inc. v. Safeco Title Ins. Co.*, 105 Wash. 2d 778, 780, 719 P.2d 531 (1986).

11         Here, Boeing argues that Smartwings' claim under the WCPA fails primarily because

12   Smartwings has not plausibly alleged that Boeing's allegedly deceptive practices affected the

13   public interest.  Dkt. #15 at 24 (further noting that "[t]he purpose of the public interest impact

14   element is to prevent plaintiffs from transforming a 'private contract' dispute into a WCPA

15   claim") (citing *Hangman Ridge*, 719 P.2d at 538).  This was the conclusion drawn by United

16   States Magistrate Judge Mary Alice Theiler in Wilmington, a conclusion that this Court

17   previously adopted.  *See Wilmington*, 2021 WL 754030.  Notably, the Court concluded that the

18   corporate purchase of 737MAX aircraft for private use was not a typical transaction in which the

19   public was likely to engage.  As a result, the Court found the public interest element missing.

20         Smartwings attempts to avoid *Wilmington*'s result[7] by focusing on Smartwings'

21   passengers—themselves the public—and distinguishing them from the sophisticated businesses

22

23   ――――――――――――――
     [7] Smartwings cites a single case in true support of its position, indicating that it was a "private
     trade infringement dispute [that] fell under CPA because public had potential for deception."

24   Dkt. #21 at 20 (citing *Nordstrom*, *Inc. v. Tampourlos*, 107 Wash. 2d 735, 733 P.2d 208 (1987)).
     But that case is distinguishable as it involved a finding by the trial court "that the appropriation

ORDER – 16

1    purchasing private aircraft in *Wilmington*.  Dkt. #21 at 20.  But the Court finds distinctions

2    between the passengers using 737MAX aircraft to be immaterial.  Rather, the focus of the WCPA

3    is on specific transactions and the deceptive or unfair practices that may exist in those

4    transactions. *See Trujillo*, 183 Wash. 2d at 835, 355 P.3d at 1107–08 (noting that "a plaintiff can

5    establish that the lawsuit would serve the public interested by showing a likelihood that other

6    plaintiffs have been or will be injured in the same fashion") (citing *Michael v. Mosquera–Lacy*,

7    165 Wash. 2d 595, 604–05, 200 P.3d 695 (2009)).

8         Even if Boeing deceived Smartwings' customers as to the safety of the 737MAX,

9    Smartwings and its customers had entirely different objectives, concerns, and results in their

10   dealings with Boeing.  Indeed, Smartwings' customers themselves had no direct dealings with

11   Boeing[8] and, while some were no doubt aware of the makeup of Smartwings' fleet, most were

12   no doubt unaware of the conduct that Smartwings alleges was deceptive or unfair.  An actionable

13   unfair or deceptive practice must at least have the "capacity to deceive a substantial portion of

14   the public."  *Trujillo*, 183 Wash. 2d at 835, 355 P.3d at 1107–08.  In short, Smartwings'

15   transactions with Boeing were distinct from its transactions with its passengers and Smartwings

16   does not plausibly allege an impact on the public interest or a claim under the WCPA.

17   //

18   //

19

20   of Nordstrom's name 'tends to and does deceive or mislead persons of ordinary caution into the
     belief that they are dealing with one concern when in fact they are dealing with the other.'"
21   *Nordstrom, Inc.*, 107 Wash. 2d at 740, 733 P.2d at 210.

22   [8] Smartwings itself draws a clear distinction between an airline passenger's purchase of a ticket
     for travel and an airline's purchase of aircraft from Boeing.  Dkt. #21 at 20 (Smartwings noting
23   that "[m]illions of passengers unknowingly endangered their lives relying on Smartwings and
     other carriers to provide safe and airworthy aircraft while Boeing concealed critical information
24   Smartwings and regulators needed to identify and address" safety risks).

ORDER – 17

1        **E.  Washington Product Liability Act Claim**

2        The WPLA provides a cause of action to remedy harm caused by defective products—

3    products that are "not reasonably safe as designed." WASH. REV. CODE § 7.72.030).  The WPLA

4    defines harm broadly, to include "any damages recognized by the courts of this state" but

5    specifically excludes "direct or consequential economic loss." *Id.* § 7.72.010(6).  In this manner,

6    the WPLA differentiates between a defective product's injury of persons or other property—

7    compensable under the "safety-insurance policy of tort law" and the WPLA—and injuries

8    inflicted only on the defective product itself—better addressed under "the expectation-bargain

9    protection policy of contract law." *Touchet Valley Grain Growers, Inc. v. Opp & Seibold Gen.*

10   *Const., Inc.*, 119 Wash. 2d 334, 351–52, 831 P.2d 724, 733 (1992) (citing *Pennsylvania Glass*

11   *Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173 (3d Cir. 1981)).

12       However, and recognizing that such a rigid rule would at times be inequitable, the

13   Washington Supreme Court has determined that economic harms may be pursued under the

14   WPLA where the product's failure was "sudden or dangerous" or implicates the safety-insurance

15   policy of tort law under an "evaluative approach." *Id.*  The sudden and dangerous test focuses

16   on the manner in which the product failed, while the evaluative approach looks to "the nature of

17   the defect, the type of risk, and the manner in which the injury arose." *Id.* at 733.

18       Here, Boeing first seeks dismissal of Smartwings' WPLA claim on the basis that

19   Smartwings has not alleged that MCAS ever activated on its 737MAX aircraft. Dkt. #23 at 14–

20   16.  Thus, Boeing argues, even if MCAS's inclusion made the 737MAX "defective" under the

21   WPLA, Smartwings and its 737MAX aircraft did not experience failure and accordingly

22   Smartwings was not harmed by the presence of MCAS.  Absent physical harm, Boeing argues,

23   a WPLA claim is not available. *Id.* at 14 ("actual 'physical harm' is required for a WPLA claim")

24   (citing *Touchet Valley*, 119 Wash. 2d at 351, 831 P.2d at 733).

ORDER – 18

The Court agrees.[9]  As Boeing notes, Smartwings does not point to any WPLA case that was permitted to proceed despite a lack of physical harm to the product itself at a minimum.  Dkt. #23 at 15.  Further, and as Boeing also notes, permitting WPLA claims to proceed upon the mere exposure to a risk of harm would substantially expand the scope of the WPLA and does not find support in the statutory text.  Dkt. #23 at 16.

Boeing also seeks dismissal of Smartwings' WPLA claim on the basis that Smartwings suffered only economic harms compensable under contract law and not "tort-like" harms that may be remedied under the WPLA.  Dkt. #23 at 17.  Again, the Court agrees.  Smartwings does not allege that any of its 737MAX aircraft were themselves damaged or that they damaged other persons or property.  Rather, Smartwings' alleged damages arise from the decreased value of the aircraft it bought, costs incurred during their grounding, and lost revenue associated with the grounding.  But these risks and damages are foreseeable and are properly allocated by contract.

F.  Leave to Amend

Where a complaint is dismissed for failure to state a claim, "leave to amend should be granted unless the court determines that the allegation of other facts consistent with the challenged pleading could not possibly cure the deficiency." *Schreiber Distrib. Co. v. Serv-Well Furniture Co.*, 806 F.2d 1393, 1401 (9th Cir. 1986).  Several times, throughout its opposition to Boeing's motion to dismiss, Smartwings has sought leave to amend any claims that the Court dismissed.  Boeing does not appear to oppose Smartwings' request for leave to amend. Accordingly, the Court grants Smartwings' request for leave to file an amended complaint re-pleading the claims dismissed in this Order.

---

[9] The Court notes that its conclusion is slightly different than its earlier conclusion in *Wilmington*.

ORDER – 19

**G. Boeing's Motion for Protective Order**

Boeing, while its motion to dismiss was pending, filed a motion seeking to limit permissible discovery to Smartwings' contract claims until a decision on the motion to dismiss was issued.  Dkt. #18.  Because the Court has ruled on the motion to dismiss, the motion for a protective order is denied as moot.

## IV.      CONCLUSION

Having reviewed the motions, the relevant briefing, and the remainder of the record, the Court hereby finds and ORDERS:

1. Defendant The Boeing Company's Motion to Dismiss (Dkt. #15) is GRANTED in part and DENIED in part as set forth in this Order.  Plaintiff Smartwings, a.s.'s claims, as set forth in its Complaint (Dkt. #1), are DISMISSED as set forth in this Order.

2. The Boeing Company's Motion for Protective Order (Dkt. #18) is DENIED as moot.

3. Plaintiff Smartwings, a.s. is granted leave to file an amended complaint within fourteen (14) days of this Order.


DATED this 25th day of February, 2022.


RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE

ORDER – 20